UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------- x

UNITED STATES OF AMERICA,                                     :
                                                              :     **MEMORANDUM &**
                                        Plaintiff,            :     **ORDER**
                                                              :
                    -against-                                 :     3:20-CR-000146 (VDO)
                                                              :
YAMIL DIAZ,                                                   :
                                                              :
                                        Defendant.            :
------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

      Yamil Diaz has been detained in connection with a supervised release violation petition since November 17, 2023. On April 9, 2025, this Court found Diaz to be incompetent and ordered him committed to the custody of the Attorney General to determine the probability of restoration. *See* 18 U.S.C. § 4241(d). Diaz now moves to stay the commitment order, pending an appeal to the Second Circuit, and the Government asks the Court to reconsider its commitment order, as well as its orders denying Diaz's motion to dismiss and denying a motion for release and modification of conditions of release.

      As explained in more detail below, were it not divested of jurisdiction, the Court would reconsider both its order requiring Diaz's commitment and its order denying the motion to dismiss. *See* Fed. R. Crim. P. 37(a)(3). In short, the Court would dismiss the supervised release violation petition. Pursuant to Rule 37(b) of the Federal Rules of Criminal Procedure, the Government is directed to promptly notify the circuit clerk of this order. In addition, the Court **grants** the motion to stay the commitment order.

## I.    BACKGROUND

### A.    Underlying Case

On September 4, 2020, Diaz pleaded guilty to one count of failing to register as a sex offender, in violation of 18 U.S.C. § 2250(a).[1] Convicted of a sex crime in Alabama state court, Diaz then moved to Connecticut without registering under the Sex Offender Registration and Notification Act ("SORNA"). On March 1, 2021, Judge Meyer sentenced Diaz to twenty-four months of imprisonment and three years of supervised release, in compliance with certain conditions.[2] Diaz began his term of supervised release on April 8, 2022.[3]

### B.    Supervised Release Violation Petition

On or around October 14, 2023, Diaz left the apartment where he had lived for several months without notifying the United States Probation Office.[4] At the request of the Probation Office, Judge Meyer issued a petition for warrant or summons as to Diaz, who was then arrested in New Jersey on November 17, 2023, and removed to Connecticut.[5] In a final violation report filed under seal, the Probation Office laid out three violations of his conditions of supervised release, including an unannounced change to his living arrangements and unlawful drug use.[6] The Probation Office concluded that "the revocation guideline imprisonment range is 5–11 months."[7]

---

[1] ECF Nos 20, 21.

[2] ECF Nos. 40, 42.

[3] Motion for Reconsideration, ECF No. 161, at 3; ECF No. 54 at 1.

[4] ECF No. 54 at 1.

[5] ECF No. 46; Motion for Reconsideration at 4.

[6] ECF No. 70.

[7] *Id.* at 4.

On February 16, 2024, Diaz moved to continue the revocation hearing as he was undergoing a psychological examination by Dr. Francisco Lopez.[8] On July 3, 2024, Diaz moved for a formal forensic psychiatric examination at Federal Medical Center ("FMC") Butner.[9] Following a hearing on the motion, Judge Garcia ordered Diaz committed to governmental custody for a psychological examination.[10] In a subsequent forensic report, filed under seal on October 16, 2024, Dr. Carmen Rodriguez concluded that Diaz was not competent and should undergo competency restoration.[11]

In the following months, the Court (Meyer, J.) did not hold a revocation hearing or make a competency finding, but instead held a series of telephonic status conferences and a supervised release hearing. Defense counsel made efforts to secure treatment for Diaz—counsel contacted local mental health authorities ("LMHAs") about the possibility of placement.[12] At a telephonic status conference on October 21, 2024, the Court indicated its intent to "dismiss the petition [] and continue Mr. Diaz on probation along with appropriate conditions the Probation Office might recommend."[13] At a conference on December 2, 2024, however, the Court (Meyer, J.) expressed doubt as to whether it "could actually enter an order of any kind" compelling treatment, given the competency issue.[14]

---

[8] ECF No. 59.

[9] ECF No. 65.

[10] ECF Nos. 74, 75.

[11] ECF No. 88.

[12] *See, e.g.,* ECF No. 98 at 1–3; ECF No. 142 at 5; ECF No. 144 at 3; ECF No. 147 at 7.

[13] ECF No. 142 at 3.

[14] ECF No. 144 at 6.

Following Judge Meyer's death, the case was transferred to the undersigned on January 7, 2025. The Court held telephonic status conferences in January and March 2025. At the first status conference, parties informed the Court that neither planned to dispute the competency report.[15] Defense counsel brought up the Drapelick Center, a halfway house, as a possible placement.[16] The Court discussed the possibility of a competency hearing involving live testimony from Dr. Rodriguez.[17] The Court also expressed concern that it had an "obligation" to decide the issue of competency, once raised.[18]

At the second telephonic status conference, held on March 6, 2025, the Court again raised the possibility of a competency hearing.[19] The Court expressed concerns with the suggestion that Diaz be released on certain conditions, given the undisputed incompetency, and concerns that New Jersey would also have to adjudicate the issue of incompetency regardless of the Court's actions.[20] The Court stated its preference for deciding the competency issue, though defense counsel shared doubts about restoration due to the possibility of forced medication and the twenty-four-month statutory maximum.[21] At the time of the status conference, no placement in Connecticut was available for Diaz.

On March 11, 2025, defense counsel filed a motion to dismiss the supervised release violation petition, arguing that Diaz could not be restored by November 17, 2025, and that the

---

[15] ECF No. 148 at 9–11.

[16] *Id.* at 5, 6–7.

[17] *Id.* at 10.

[18] *Id.* 21.

[19] ECF No. 149 at 12.

[20] *Id.* at 5, 12. The prosecution in New Jersey is discussed in more detail below.

[21] *Id.* at 14–15.

Government would have no interest in restoration under *Sell v. United States*, 539 U.S. 166 (2003).[22] Counsel also objected to the possibility of a remote competency hearing. In its response to the motion, the Government asked the Court to adjudicate the issue of competency while holding the supervised release petition in abeyance.[23] The Government agreed that involuntary medication would not be appropriate under *Sell*.

On March 14, 2025, defense counsel moved for Diaz's release under 18 U.S.C. § 3143(a) and the modification of his conditions of supervised release.[24] The defense asked the Court to order Diaz to reside at the first available bed in the Drapelick Center, enforced by electronic monitoring, and comply with treatment recommendations, among other conditions.[25] The Government filed a response on April 9, 2025, again asking the Court to refrain from dismissing the supervised release petition but submitting that the conditions proposed by the defense would be "acceptable."[26]

On April 9, 2025, the Court issued an order finding Diaz incompetent by a preponderance of the evidence.[27] The Court ordered Diaz committed to the custody and care of the Attorney General for treatment, pursuant to 18 U.S.C. § 4241(d), and required the parties to file a status report as to Diaz's position on the wait list or admission into a facility every forty-five days. The Court denied the motion to dismiss without prejudice, concluding that the

---

[22] *See generally* Motion to Dismiss, ECF No. 122-1.

[23] Gov. Response, ECF No. 129.

[24] Motion to Modify Conditions of Release, ECF No. 128.

[25] *Id.* at 2.

[26] ECF No. 131 at 1.

[27] Commitment Order, ECF No. 135.

*Sell* argument was premature, and it denied the motion to release Diaz and modify his conditions of release.[28]

On April 10, 2025, Diaz filed a notice of appeal, and on April 25, 2025, Diaz filed a motion to stay the Court's Commitment Order, contending that he has a strong position on the merits and that a transfer to FMC Butner—then scheduled for July—would irreparably harm him.[29] Counsel informed the Court that on April 10, 2025, Diaz was transferred from Bureau of Prisons ("BOP") custody to the Hartford Correctional Center ("HCC"), where his newly assessed mental health score worsened, going from a one to a three.[30] In its response to the motion, the Government took no position, instead deferring to the Court's discretion.[31] On May 12, 2025, the parties filed a status report under seal as to Diaz's anticipated admission into a BOP facility and his treatment and health at HCC.[32]

On May 15, 2025, the Government filed a consent motion for reconsideration of the Court's Commitment Order, and its orders denying the motion to dismiss and denying the motion for release and modification of the conditions of release.[33] It argued that restoration could not be completed by November 17, 2025, citing recent examples of restoration in the District, and again raised the issue of involuntary medication under *Sell*. On May 16, 2025,

---

[28] ECF Nos. 136, 137.

[29] Notice of Appeal, ECF No. 138; Motion to Stay, ECF No. 151, at 2–5.

[30] Motion to Stay at 5.

[31] ECF No. 155.

[32] ECF No. 158.

[33] *See generally* Motion for Reconsideration.

Diaz filed a supplemental memorandum in support of a stay, summarizing recent conversations with a director at a local mental health agency that encompasses the Drapelick Center.[34]

On June 13, 2025, defense counsel filed an emergency status report and a motion for an immediate status conference, indicating that "FMC Butner will be ready for [Diaz] by . . . June 18," as opposed to an unspecified date in July, as previously indicated.[35]

### C.    New Jersey Proceedings

Diaz remains on probation in New Jersey. On January 7, 2022, he pleaded guilty to arson in the third degree.[36] He was then sentenced to a four-year term of probation and permitted to serve the term through federal parole. When Diaz was charged with the instant supervised release violation, probation violation proceedings were initiated in New Jersey.[37]

Throughout these federal proceedings, defense counsel has communicated with the New Jersey Public Defender's Office. According to defense counsel, a supervisor in that office stated that "the rearrest warrant and consequent [d]etainer could [likely] be vacated and [Diaz] could be terminated from probation down there."[38] At a telephonic status conference, counsel stated that if Diaz were released to the New Jersey detainer and warrant, "he would be brought back [to Connecticut] for a hearing and implementation of whatever plan was put together."[39] Though defense counsel had no "assurances" that New Jersey would promptly release Diaz back to Connecticut, he viewed "this [as] a case that would be fairly quickly disposed of down

---

[34] ECF No. 162.

[35] ECF No. 163 at 1.

[36] Motion to Dismiss Ex. G, ECF No. 122-4, at 5.

[37] Motion to Dismiss at 8.

[38] ECF No. 144 at 3.

[39] ECF No. 149 at 3.

there."[40] In addition, the supervisor indicated that New Jersey did not have sufficient resources for Diaz.

Until March 4, 2025, the parties believed that New Jersey had issued a detainer such that Diaz would be taken into state custody upon release from federal custody.[41] However, further investigation revealed that New Jersey had only issued a warrant for his arrest. The United States Probation Office learned that New Jersey planned to send a hard copy of the warrant to the relevant facility; in the event of Diaz's release, state officials would then schedule a pick-up time.[42] During the status conference on March 6, 2025, counsel mentioned that the Court could potentially hold Diaz "in temporary detention [for up to ten days] such that detainers or warrants from other jurisdictions [could] be served."[43] On April 7, 2025, the United States Probation Office confirmed that the Donald W. Wyatt Detention Facility had received a copy of the warrant.[44]

## II.    **LEGAL STANDARD**

### A.    **Motion for Reconsideration**

Rule 7(c) of the Local Rules of Civil Procedure governs motions for reconsideration in civil and criminal proceedings. *See* D. Conn. L. Cr. R. 1(c) (applying Local Civil Rule 7(c) to criminal proceedings); *see also United States v. Roye*, No. 3:15-CR-29 (JBA), 2016 WL 4147133, at *2 n.3 (D. Conn. Aug 4, 2016) (applying the civil standard to a motion for

---

[40] *Id.* at 5–6.

[41] Motion to Dismiss at 8.

[42] ECF No. 149 at 6–7.

[43] *Id.* at 18–19.

[44] ECF No. 130 at 2.

reconsideration filed in a criminal proceeding). The standard for granting a motion for reconsideration is strict. *See Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995); *see also Archibald v. City of Hartford,* 274 F.R.D. 371, 382 (D. Conn. 2011). Courts should generally deny such motions "unless the movant can point to controlling decisions or data that the court overlooked" in the underlying order. D. Conn. L. Civ. R. 7(c). In general, three grounds justify reconsideration: "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir. 1992) (cleaned up). Ultimately, "[a] motion for reconsideration is committed to the sound discretion of the court." *Kregos v. Latest Line, Inc.*, 951 F. Supp. 24, 26 (D. Conn. 1996).

That said, "[a] notice of appeal 'confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.'" *United States v. Ransom*, 866 F.2d 574, 575 (2d Cir. 1989) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)). It is "not tolerable to have a district court and court of appeals simultaneously analyzing the same judgement." *United States v. Jacques*, 6 F.4th 337, 342 (2d Cir. 2021) (quoting *Griggs*, 459 U.S. at 59) (cleaned up). Nevertheless, under Rule 37(a) of the Federal Rules of Criminal Procedure, a district court faced with a motion that it has no jurisdiction to decide retains some leeway: the court may defer consideration of the motion, deny it, or "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Crim. P. 37(a)(3). The movant must "promptly notify the circuit clerk" if the lower court indicates that it would grant the motion or that the motion raises a substantial issue. *Id.* 37(b).

B.    **Motion to Stay**

"The proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997). A stay is "not a matter of right," *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926), but is instead "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case." *Id.* at 672–73. A court's discretion, however, is "not unguided." *Carroll v. Trump*, 687 F. Supp. 3d 398, 400 (S.D.N.Y. 2023); *Nken v. Holder*, 556 U.S. 418, 434 (2009). A court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Sailor v. Scully*, 666 F. Supp. 50, 51 (S.D.N.Y. 1987) (describing the four factors regulating issuance of a stay). The first two factors are "the most critical," *Nken*, 556 U.S. at 434, but together, these four factors function "somewhat like a sliding scale," *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (quoting *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002)). More of one requires less of the others. *Id.*; *see also Carroll*, 687 F. Supp. 3d at 399–400.

III.    **<u>DISCUSSION</u>**

Though the Court no longer has jurisdiction over the matter due to the pending appeal, the Court would reconsider its order denying the motion to dismiss and its Commitment Order, as explained below. *See* Fed. R. Crim. P. 37(a). And in light of this conclusion, the Court must also stay the Commitment Order.

A. **The Court Would Reconsider its Commitment Order and its Order Denying the Motion to Dismiss.**

Based on new evidence, the Court would reconsider its Commitment Order and its denial of Diaz's motion to dismiss the supervised release petition in order to prevent "manifest injustice." *Virgin Atl. Airways*, 956 F.2d at 1255. As the Government notes in its motion for reconsideration, Diaz will almost certainly remain incompetent come November 17, 2025, the two-year mark since his detention and the statutory maximum for the alleged supervised release violation.

The Government has put forward "new evidence" that allows the Court to reach this conclusion. Specifically, the Government has laid out recent timelines related to restoration in the District. For instance, in *United States v. McCormick*, No. 19-CR-263, the court (Dooley, J.) ordered a criminal defendant committed under 18 U.S.C. § 4241(d) on October 14, 2020.[45] The defendant was only transferred to FMC Butner for treatment on January 20, 2021.[46] On February 18, 2021, the court noted that the four-month commitment period under 18 U.S.C. § 4241(d) had expired, and it scheduled a hearing to determine whether the defendant was restored to competency or whether restoration was substantially probable.[47] Following the recommendation that the defendant could likely be restored within 120 days, the court extended the period of commitment to September 29, 2021.[48] Around October 4, 2021, evaluators suggested that the defendant could "understand the nature and consequences of the

---

[45] *United States v. McCormick*, No. 19-CR-263, ECF No. 100.

[46] *McCormick*, ECF No. 106.

[47] *Id.*

[48] *McCormick*, ECF No. 114 at 2.

proceedings against him," though the competency hearing that resulted in a certificate of restoration did not occur until January 2022.[49] In other words, at best, the defendant was restored a year after the court's finding of incompetence.

In a more recent case from this District, *United States v. Haworth*, No. 23-CR-205, a court (Meyer, J.) committed an incompetent criminal defendant for the requisite four-month period on June 24, 2024.[50] The defendant was only transferred to the relevant facility in mid-December 2024, six months later[51]. In May 2025, the court (Hall, J.) extended the defendant's period of commitment through August 1, 2025, based on the report of a forensic psychologist.[52] Though restoration is ongoing in this matter, eleven months have already elapsed since the court first found the defendant incompetent under § 4241(d).

Based on this evidence and the parties' representation that Diaz may be transferred to FMC Butner at some point in June or July, the Court would reconsider its Commitment Order and its order denying the motion to dismiss. Diaz has been detained pursuant to the supervised release violation petition since November 17, 2023, over a year and a half ago. On April 9, 2025, the Court found him incompetent and ordered his commitment under 18 U.S.C. § 4241(d) for a period not to exceed four months. The plain language of the statute suggests that the clock begins to run when a defendant enters the restoration facility.[53] Thus, if Diaz is

---

[49] *McCormick*, ECF No. 127 at 2; ECF No. 135.

[50] *United States v. Haworth*, No. 23-CR-205, ECF No. 58.

[51] *Haworth*, ECF No. 64 at 1.

[52] *Haworth*, ECF No. 71.

[53] Indeed, in *United States v. Magassouba,* 544 F.3d 387, 412–13 (2d Cir. 2008), the Second Circuit confirmed that time spent waiting for admission into a suitable psychiatric facility following a finding of incompetence did not count towards the four-month maximum under § 4241(d).

transferred to FMC Butner in July, the four-month period will expire in November 2025. The Court can assume, from the reports filed by BOP evaluators in other cases, that in November 2025, the evaluator assigned to Diaz will request a 120-day extension to continue treatment and evaluation. The Court has reviewed other cases involving incompetent defendants in the District—these defendants have not been restored to competency in the first four-month period. In the Court's view, therefore, Diaz is *very unlikely* to be restored by November 2025.

When a defendant is committed "solely on account of [] incapacity" and "for more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future," this period of detainment triggers a due process concern. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). And though the Second Circuit has expressly declined to use the underlying sentence facing a defendant as a "benchmark for assessing the reasonableness of confinement to restore competency," a court need not turn a blind eye to the sentence. *Magassouba*, 544 F.3d at 416.[54] Instead, the Circuit has directed lower courts to consider "the totality of the circumstances, including (1) the length of time at issue; (2) the medical assessments of the defendant's ability to attain competency; (3) the reason for any delay in helping the defendant attain competency; (4) the defendant's

---

[54] Of relevance here, the Second Circuit has not decided whether a defendant may remain in custody for treatment and restoration beyond the maximum possible term of imprisonment for the underlying offense. *See Magassouba*, 544 F.3d at 416. Conversely, the First Circuit has explained that "the very purpose and legitimacy of competence determinations – a procedure for protecting the accused – foreclose their use as a means of committing accused persons for longer than permitted as a sentence." *United States v. DeBellis*, 649 F.2d 1, 3 (1st Cir. 1981). In addition, though the Court does not reach the *Sell* issue put forward by the parties, a court deciding a motion for an order requiring involuntary medication may take into account the underlying statutory maximum. *See, e.g., United States v. Weinberg*, 743 F. Supp. 2d 234, 238 (W.D.N.Y. 2010) (weighing the period of detainment against the Guidelines range and the statutory maximum in deciding that the Government did not have a strong interest in restoration). In sum, the statutory maximum is an important consideration at all stages of restoration and competency proceedings.

assertion of his rights, whether as to custody or treatment; and (5) any prejudice to the defendant, whether in attaining competency or in proceeding thereafter to trial." *Id.* at 416–17.

In the same vein, pretrial detention more generally may also offend due process. The Second Circuit has identified no "bright-line limit on the length of pretrial detention," *United States v. Briggs*, 697 F.3d 98, 101 (2d Cir. 2012), but a lower court must weigh a variety of factors to assess a potential due process violation: "the strength of the evidence justifying detention, the government's responsibility for the delay in proceeding to trial, and the length of the detention itself." *Id.*; *see United States v. El–Hage,* 213 F.3d 74, 79 (2d Cir. 2000); *United States v. El–Gabrowny,* 35 F.3d 63, 65 (2d Cir. 1994).

Here, considering the totality of the circumstances, were it not divested of jurisdiction, the Court would conclude that Diaz's continued confinement for an alleged supervised release violation presents a due process concern. By November 2025, Diaz will have been detained for *two years* on the supervised release violation petition. Based on the violation report filed by the Probation Office, the statutory maximum in this case would be two years of imprisonment, and the Sentencing Guidelines range would be only five to eleven months' imprisonment.[55] *See United States v. Jones*, No. 15-CR-184, 2016 WL 3962776, at *3 (D. Conn. July 21, 2016) ("Because the sentencing guidelines range applicable in his case is eight to fourteen months, [defendant] has already served a term of imprisonment as long as, if not longer, than this Court could have imposed upon him, consistent with the Federal Sentencing Guidelines, had he been competent[.]"). In sum, the Court finds that the first factor favors Diaz. The second factor is of little relevance, here, since no medical professional has evaluated

---

[55] ECF No. 70.

whether restoration is possible. As to the third factor, the Court notes that it has been partially responsible for that delay: the forensic competency report was received in October 2024, but the Court did not take action until April 2025, when it found Diaz incompetent and ordered him committed to the custody of the Attorney General. And though the fourth factor is also of little relevance, the fifth factor weighs in his favor. As defense counsel notes in the motion to stay, his mental health may have deteriorated since his transfer to HCC, and the sealed medical records lend some support to that assertion.[56] Finally, the Government and the defense agree that this period of detention does not comport with due process. In sum, applying the *Magassouba* factors, the Court concludes that continued detention poses a due process concern.

Because Diaz is not currently confined solely on account of his incapacity,[57] the Court also assesses the potential due process violation under the *Briggs* factors. First, the Government presented little evidence—if any—justifying detention at the hearing on December 19, 2023, because Diaz consented to pretrial detention at that time.[58] On the other hand, the Government is not fully responsible for the prolonged delay. In February 2024, the defense moved to continue the supervised release hearing from February 2024 to July 2024 because of "continued concerns about Mr. Diaz's mental health and the need for examination[.]"[59] During that stretch, Dr. Lopez evaluated Diaz and concluded that he was not

---

[56] Motion to Stay at 5; ECF No. 158-1 at 5–6, 28.

[57] *See* ECF No. 50. When the Government moved for Diaz's detention following his arrest in November 2023, the Government argued that he was a flight risk. Diaz consented to detention. *See* ECF No. 55. The Court therefore finds that he is not confined "solely" on account of his incapacity.

[58] ECF Nos. 51, 55.

[59] ECF No. 59 at 1.

competent to stand trial.[60] It was in July 2024 that the defense moved for a formal competency evaluation under 18 U.S.C. § 4241(a).[61] The Court next turns to the third factor: the length of the delay. Again, Diaz has been detained on a supervised release violation petition for almost nineteen months. Though the Second Circuit has rejected due process challenges to much longer detention periods, *see United States v. Hill*, 462 F. App'x 125, 127 (2d Cir. 2012) (summary order) (upholding twenty-four-month detention), the Court sees a troubling discrepancy between this period of detention and the underlying petition. Just as the Court finds a due process concern under the *Magassouba* factors, which apply to detention solely on the basis of incompetency, the Court finds a due process concern under the *Briggs* factors, which apply more generally to pretrial detention.

As to the remedy for this due process concern, the Court would dismiss the supervised release petition, were it not divested of jurisdiction. All parties ask the Court to dismiss the petition—the Government does not suggest an alternative remedy. *Cf. United States v. McAfee*, No. 18-CR-425, 2021 WL 106268, at *2–3 (S.D.N.Y. Jan 12, 2021) (finding that dismissal of an indictment was not appropriate where a defendant was incompetent). For this reason, the Court would reconsider its Commitment Order and its denial of the motion to dismiss the petition.

What the Court would not do, however, is dismiss the petition because of the specter of *Sell*. Under Supreme Court precedent, if an incompetent criminal defendant refuses medication, a court must apply a four-part test to determine whether the defendant can be

---

[60] ECF No. 65 at 3.

[61] ECF Nos. 65, 67.

forced to take medication: first, the court must conclude that "important governmental interests" are at stake; second, involuntary medication must "*significantly further*" those interests; third, involuntary medication must be "*necessary*" to further the governmental interests; and finally, administration of the drugs must be in the patient's best medical interest in light of his medical conditions. *See Sell*, 539 U.S. at 180–81. In *United States v. Boima*, 114 F.4th 69 (2d Cir. 2024) (per curiam), the Second Circuit elaborated on the *Sell* test, directing lower courts to weigh the statutory maximum and minimum, the Guidelines imprisonment range, and "the nature or effect of the underlying conduct," among other considerations. *Id.* at 77.

The parties insist that the case presents an issue under *Sell*. Defense counsel has repeatedly urged that Diaz would likely require involuntary medication to regain competency, and the Government has echoed this position.[62] Specifically, defense counsel contends that "both doctors who have examined Mr. Diaz believe [it] likely [that] the government and BOP would be forced to seek an order for forced anti-psychotics" under *Sell*.[63] Indeed, Dr. Rodriguez opined via email that "it is unlikely that [Diaz] will voluntarily comply with psychiatric intervention and motions for involuntary treatment may be warranted pursuant to *Sell*," because he had little insight into his own mental health and "was resistant" to taking medication during the competency evaluation.[64] The Government has further conceded that it

---

[62] Motion to Dismiss at 11; Motion for Reconsideration at 13.

[63] Motion to Dismiss at 20.

[64] Motion to Dismiss, Ex. E, ECF No. 122-2, at 2.

would not seek a court order requiring involuntary medication because it has no important governmental interest in restoration.[65]

The Court defers to this medical expertise, but it finds that the shadow of *Sell* does not justify dismissal. The Court cannot apply or even reach the four-part *Sell* test at this stage: Diaz has not yet been hospitalized under § 4241(d), so no medical professional has prescribed any medication to Diaz. In short, Diaz has not had the chance to refuse medication, so the issue is not ripe for adjudication. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) ("A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"). *Boima* only supports the Court's conclusion. In *Boima*, the defendant was first committed for four months under § 4241(d) to determine whether there was a substantial probability that he would regain competency. 114 F.4th at 73. It was only *after* his admission into FMC Butner in December 2021 that the defendant refused to take psychotropic medication prescribed by a psychiatrist. *Id.* The district court then urged the government to "consider withdrawing the complaint"—when the Government demurred, the court initiated *Sell* proceedings. *Id.* at 74. *Boima* instructs lower courts to consider a variety of factors in applying the *Sell* test, but it does not instruct them to anticipate the possibility of involuntary medication before a defendant has been hospitalized under § 4241(d).[66] Such a

---

[65] Motion for Reconsideration at 14; Motion to Dismiss at 11.

[66] In *United States v. Brennan*, a district court addressed a related argument: whether commitment under § 4241(d) was unconstitutional when there was no "reasonable likelihood" that the defendant could regain competency. In the court's view, commitment under § 4241(d) "is meant to provide a definitive answer to [the] question" of whether a defendant can be restored to competency. *Id.* at 260 (citing *United States v. Ferro*, 321 F.3d 756, 762 (8th Cir. 2003)). Thus, the court did not entertain the premature argument that restoration was impossible—commitment under § 4241(d) was the appropriate way to determine the probability of restoration. Here, too, the parties seek to

rule would force courts to speculate, to decide issues that have not yet fully matured on the record.

The Court therefore soundly rejects the Government's contention that "[b]y not precluding involuntary medication to restore competency, the Court's order of restoration [] conflicts with [*Boima*]."[67] The Government is correct that the Court did not address the possibility of forced medication in the Commitment Order, but silence on the subject is not authorization. Once a defendant is hospitalized under § 4241(d) and refuses medication, BOP officials will not forcibly administer medication without a court order, pursuant to *Sell*. *See Magassouba*, 544 F.3d and 396. The Court was not required to remind the BOP of its obligations under *Sell*. A district court need not "preclude involuntary medication"[68] in a commitment order under § 4241(d) because such an inclusion would be redundant—*Sell* proceedings address that eventuality. Further, the Court has encountered no similar § 4241(d) commitment order that "precludes involuntary medication."[69] The Court would not dismiss the petition on the basis that Diaz might refuse medication that he has not yet been prescribed.

---

short circuit the analysis. It is only once a defendant refuses prescribed medication that a court can address whether forced medication is appropriate.

[67] Motion for Reconsideration at 13.

[68] Motion for Reconsideration at 13.

[69] *See, e.g., United States v. McCormick*, No. 19-CR-263, ECF No. 100 (finding a defendant incompetent and committing him to the custody of the Attorney General under § 4241(d) without addressing the possibility of future involuntary medication).

**B.    The Court Would Not Reconsider its Order Denying the Motion for Release and Modification of Conditions of Release.**

The Government also asks the Court to reconsider its order denying the motion for release under the Bail Reform Act[70] and modification of his conditions of release.[71] In the Government's view, the proposed conditions of release—including electronic location monitoring and home detention at the Drapelick Center—will "ensure the safety of the community while Mr. Diaz remains on supervised release."[72]

In the Court's estimation, Diaz cannot at this time fully consent to these newly proposed conditions of release. As evidenced by the submissions in this matter and the competency evaluation, Diaz has fixated on what he perceives to be a vast conspiracy permeating the highest rungs of the federal government.[73] He perseverates on this conspiracy, and he does not seem to understand this Court's role in his supervised release violation proceedings.[74] The Court is reticent to impose additional conditions of release on Diaz, who is unlikely to understand these conditions in full and to appreciate the importance of adherence. Indeed, as a court in the District of New Jersey noted, "[t]he imposition of bail conditions . . . presupposes the defendant's ability to adhere to them; indeed, if a defendant does not agree to comply, he risks detainment." *United States v. Peppi*, No. 06-CR-157, 2007 WL 674746, at *5 (D.N.J.

---

[70] As to the first issue, the Court need not reconsider the arguments in favor of release under 18 U.S.C. § 3143(a). Because the Court would dismiss the supervised release violation petition for due process reasons, it would release Diaz on that basis.

[71] Motion for Reconsideration at 17.

[72] *Id.* at 17.

[73] ECF No. 65.

[74] For instance, during the detention hearing on December 19, 2023, Diaz insisted that counsel raise certain issues before the Court that had no bearing on the issue of detention.

Feb. 28, 2007). The same logic applies to the imposition of new conditions of release. The Court will not ask an incompetent defendant to abide by conditions of release he may not comprehend.[75] Further, to impose these conditions on Diaz would be to risk additional supervised release violation proceedings.

The Court also entertains doubts as to whether the Drapelick Center can meet Diaz's current needs. Defense counsel proposes that Diaz remain at the halfway house and submit to electronic monitoring. However, in the most recent status report, defense counsel includes Dr. Lopez's opinion that Diaz may need "the most intensive care available after discharge, ideally something with a residential component."[76] However, the Drapelick Center does not appear to offer intensive residential care in Spanish. In that same status report, defense counsel indicates that Diaz could reside at the Drapelick Center but receive more intensive treatment out of the Capital Region LMHA. These statements alone do not assuage the Court's doubts. Even putting aside his ability to consent to the additional conditions of release, the Court hesitates to order Diaz to live at a halfway house that might not serve his needs.

In the motion for release and modification of conditions of release, defense counsel represents that the New Jersey warrant is not an impediment to release. Defense counsel proposes that the Court temporarily detain Diaz pursuant to 18 U.S.C. § 3142(d)(1)(A)(iii), giving New Jersey a fixed number of days—no more than ten—to retrieve him. This subsection of the Bail Reform Act requires a judicial officer to order the temporary detention of a person

---

[75] Other courts, however, have taken a less conservative approach. For instance, in *McAfee*, 2021 WL 106268, at *4, the district court released an incompetent defendant on certain conditions, including the condition that he reside with a family member.

[76] ECF No. 162 at 2.

on state parole or probation and "direct the attorney for the Government to notify the appropriate court, probation or parole official, or State or local law enforcement official[.]" To the extent that defense counsel makes this proposal in order to encourage New Jersey to act promptly, the Court might issue the proposed temporary detention order under 18 U.S.C. § 3142(d)(1)(A)(iii). The Court notes, however, that New Jersey is not required to retrieve Diaz within the ten-day window specified in § 3142(d)(1)(A)(iii). This subsection seems to delay federal Bail Reform Act proceedings until state officials have had an opportunity to retrieve a defendant. If the Court were to issue such an order and New Jersey were to fail to retrieve Diaz, New Jersey could still arrest Diaz after his release from federal custody.[77]

Aligned with this proposal are defense counsel's representations that New Jersey will quickly dispose of the probation matter, then return Diaz to Connecticut. For instance, during the telephonic status conference on March 6, 2025, defense counsel suggested that New Jersey would return Diaz to Connecticut for the implementation of a proposed restoration plan.[78] Indeed, a supervisory state public defender from New Jersey "thought it plausible the New Jersey probation could be terminated as 'unsuccessful,' which would end the case with no further consequence to Mr. Diaz."[79] But these statements, without more, do not convince the Court that New Jersey plans to terminate Diaz's probation. That state could have done so at any point during the past eighteen months. In the alternative, New Jersey could also have stated its intent to terminate probation in a letter to the Court or to counsel. Instead, when a United

---

[77] Of course, because the Court would *dismiss* the supervised release violation petition, as requested by the parties, the Court fails to see how the Bail Reform Act, which governs release or detention pending trial, appeal, or sentence, would apply to Diaz.

[78] ECF No. 149 at 3.

[79] Motion to Dismiss at 9.

States Probation Officer reached out to the relevant New Jersey authorities in April 2025, the Probation Officer learned that a detainer would not be entered, but "a hard copy of the warrant [for Diaz's arrest] would be forwarded to the facility where Mr. Diaz is currently held."[80] This suggests that New Jersey retains an interest in prosecuting Diaz. The Court will not assume that New Jersey will fail to retrieve Diaz or defer to a restoration plan developed in this District.

Defense counsel also suggests that New Jersey cannot give Diaz the mental health resources that he requires at this juncture. According to defense counsel, the same supervisory state public defender indicated that "New Jersey was unlikely to have the resources Mr. Diaz needed[.]"[81] But in tension with this assertion are defense counsel's determined efforts to secure a bed for Diaz in a residential facility either run or funded by the state of Connecticut. The parties—and the Court—agree that Connecticut offers a variety of mental health facilities, in-patient and out-patient, where the federal system offers only in-patient restoration under § 4241. Like Connecticut, New Jersey operates a Division of Mental Health and Addiction Services, and the website suggests that the agency offers or partners with a variety of mental health treatment options across the state, some in Spanish. *See Dep't of Human Services, Division of Mental Health and Addiction Servs.*, https://nj.gov/humanservices/dmhas/home/ (last visited June 3, 2025). In addition, counsel in the New Jersey matter could certainly engage in efforts to restore Diaz to competency resembling counsel's efforts in this matter. The Court assigns little weight to the assertion that New Jersey is unlikely to help or restore Diaz.

---

[80] ECF No. 130 at 2.

[81] Motion to Dismiss at 9.

Were it not divested of jurisdiction because of the pending appeal, the Court would decline to reconsider its order denying the motion for release and modification of the conditions of release. Pending further discussion with counsel, the Court would likely order Diaz released to the New Jersey authorities.

**C.    The Court Grants the Motion to Stay the Commitment Order.**

In light of this indicative ruling, the Court must stay its Commitment Order. Diaz contends that each factor favors a stay in this matter: not only has he made a strong showing that he is likely to succeed on the merits, but a stay would also insulate against irreparable harm.[82] He argues that a stay would neither injure the Government's interests nor the public's interests.

First, though a "district court that issued an order that is being challenged on appeal may be predisposed to be unimpressed by the challenges to that ruling," the Court agrees with Diaz: the timeline for restoration offends due process. *Meyer v. Kalanick*, 203 F. Supp. 3d 393, 395 (S.D.N.Y. 2016). The Court has already explained why it would dismiss the petition and reconsider its order denying the motion to dismiss. In November 2025, Diaz will reach the two-year mark of his detention, but he is unlikely to be competent by then. The Court has reviewed other cases involving incompetent defendants in the District, and it concludes that restoration would require too long a period of confinement. Thus, Diaz has made a strong showing that he is likely to succeed on the merits of a due process claim. *See Nken*, 556 U.S. at 434.

---

[82] Motion to Stay at 3–5.

The Court also finds that a stay would protect Diaz from irreparable harm. Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003) (citations omitted). Put otherwise, irreparable harm occurs "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India,* 175 F.3d 245, 249–50 (2d Cir. 1999). As noted above, Diaz may have deteriorated in recent months—during a previous period of state incarceration, he was initially assigned a mental health score of one. He has since received a new score of three.[83] Another transfer, this time to North Carolina, could well lead to further mental health decompensation. Ultimately, a transfer to FMC Butner would likely be fruitless as Diaz would not be restored within the next six months. In all likelihood, Diaz would then be transported back to Connecticut, further endangering his mental health. If counsel secured a viable treatment plan within Connecticut for Diaz during this period of restoration, he would likely have to forgo that opportunity. For these reasons, there is a "substantial chance" that, without a stay, the parties could not return to their previous positions. *Brenntag Int'l Chem.*, 175 F.3d at 249–50.

As to the third and fourth factors, less significant than the first two, a stay would not substantially injure the other parties. The Government takes no position on the motion to stay, instead deferring to the Court.[84] In fact, the Government's motion for reconsideration suggests

---

[83] Motion to Stay at 5. The records suggest that when Diaz was first in state custody, he received a mental score of one. Following his transfer from Wyatt on April 10, 2025, he was evaluated and given the same score. However, around April 11, 2025, he was evaluated again and given a score of three.

[84] ECF No. 155.

it does not oppose the stay. Finally, the public has no countervailing interest in the enforcement of the Commitment Order, which would only prolong Diaz's confinement without restoring him to competency.

## IV.   <u>CONCLUSION</u>

Were it not divested of jurisdiction, the Court would grant the motion for reconsideration of its order committing Diaz to the custody of the Attorney General under 18 U.S.C. § 4241(d) and its order denying the motion to dismiss. *See* Fed. R. Crim. P. 37(a)(3). The Court would not reconsider its order denying the motion for release and modification of the conditions of release. The Court would instruct HCC to release Diaz to New Jersey's custody for the adjudication of the probation violation. Because Diaz has been in custody since November 17, 2023, he will remain on supervised release for over a year upon his release. If Diaz returns to Connecticut following the adjudication of his New Jersey probation violation, the parties may ask the Court to impose additional conditions of supervised release. At that point, the Court would likely schedule a supervised release hearing.

In addition, the Court **grants** the motion to stay the commitment order. The Government is directed to promptly notify the circuit clerk of this order. *See* Fed. R. Crim. P. 37(b). The Court will schedule a status conference in due course.

**SO ORDERED.**

Hartford, Connecticut
June 13, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge